RMT:PWB
F.#2016R01622

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – x

UNITED STATES OF AMERICA                    **TO BE FILED UNDER SEAL**

  - against -                                  COMPLAINT AND AFFIDAVIT
                                            IN SUPPORT OF APPLICATION
VOLODYMYR NEDOVIZ,                          FOR ARREST WARRANT

               Defendant.        **Case No. 17-M-208**

                                            (T. 18, U.S.C. § 371 and 2;
                                             T. 22, U.S.C. § 2778;
                                             T. 50, U.S.C. § 1705)

– – – – – – – – – – – – – – – – x

EASTERN DISTRICT OF NEW YORK, SS:

       JOSEPH H. RUDNICK, being duly sworn, deposes and states that he is a

Special Agent with the Federal Bureau of Investigation, duly appointed according to law and

acting as such.

       Upon information and belief, in or about and between November 27, 2014 and

March 6, 2017, both dates being approximate and inclusive, within the Eastern District of

New York and elsewhere, the defendant VOLODYMYR NEDOVIZ, together with others,

did knowingly, intentionally and willfully export, attempt to export, and conspire to export

from the United States to Ukraine items on the United States Munitions List, to wit: rifle

scopes and thermal imaging equipment, without first having obtained a license from the

Department of State, Directorate of Defense Trade Controls, in violation of Title 22, United

States Code, Section 2778 and Title 18, United States Code, Sections 371 and 2.

(Title 22, United States Code, Section 2778; Title 18, United States Code, Sections 371 and 2)

Further, upon information and belief, in or about and between November 27, 2014 and March 6, 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant VOLODYMYR NEDOVIZ, together with others, did willfully export, attempt to export, and conspire to export from the United States to Ukraine items on the United States Commerce Control List, to wit: rifle scopes and thermal imaging equipment, without first having obtained a license from the United States Department of Commerce, in violation of Title 50, United States Code, Section 1705 and Title 18, United States Code, Section 2.

(Title 50, United States Code, Section 1705; Title 18, United States Code, Section 2).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the FBI.  I have been a Special Agent since February 2013.  As an FBI Special Agent, I have investigated numerous matters during the course of which I have conducted physical and electronic surveillance, interviewed witnesses, executed court-authorized search warrants and used other investigative techniques to secure relevant information.  I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

information provided to me by other agents and law enforcement officials; and information otherwise obtained by credible and reliable sources.

2. Based on my training and experience as a Special Agent with the FBI and the facts set forth in this affidavit, there is probable cause to believe that the defendant VOLODYMYR NEDOVIZ, together with others, knowingly, intentionally and willfully exported, attempted to export, and conspired to export, from the United States to Ukraine items on the United States Munitions List ("USML") and United States Commerce Control List ("CCL"), to wit: rifle scopes and thermal imaging equipment, without first having obtained a license from (a) the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), in violation of the Arms Export Control Act ("AECA") (22 U.S.C. § 2778) and (b) the United States Department of Commerce ("DOC"), in violation of the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1705).

I. APPLICABLE REGULATIONS

3. The export of defense-related articles is regulated by the AECA, Title 22, United States Code, Section 2778. Section 2778(a) authorizes the President of the United States to control the import and export of defense articles and to establish the USML, which identifies and defines the defense articles subject to these controls. Section 2778(b) provides that any person engaged in the business of manufacturing or exporting any defense articles shall register with the government. Section 2778(c) establishes criminal penalties for any violation of Section 2778 or any rule or regulation thereunder.

4. By executive order, the President delegated the authority to control the export of defense articles to the United States Department of State, Directorate of Defense Trade Controls ("DDTC"). Accordingly, the DDTC promulgated regulations under the

AECA, which were known as the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120 – 130.  These regulations established the USML and required an export license from the DDTC for the export of items on the USML.

5.     Under the IEEPA, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy or economy of the United States.  See 50 U.S.C. § 1701(a).   Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law.  Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

6.     Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001.  66 Fed. Reg. 44,025 (Aug. 22, 2001).  While in effect, the EAA regulated the export of goods, technology and software from the United States.  Pursuant to the provisions of the EAA, the Department of Commerce's Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA.  See 15 C.F.R. § 730.2.  In Executive Order 13,222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA.  Presidents have issued annual Executive Notices extending the national emergency declared in Executive

Order 13,222 from the time period covered by that Executive Order through the present.

See, e.g., 81 Fed. Reg. 52,587 (Aug. 8, 2016).

7.      Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation or prohibition issued pursuant to the statute.  See 50 U.S.C. § 1705(a).  Willful violations of the EAR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine.  See 50 U.S.C. § 1705(c).

8.      Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items.  See 15 C.F.R. §§ 734.2-.3.  In particular, BIS has placed restrictions on the export and re-export of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user and the end use.

9.      The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL," set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had export control requirements depending on destination, end use and end user.

II.      THE INVESTIGATION

A.      Background

10.      The FBI, in conjunction with the DOC, and the Department of Homeland Security, Homeland Security Investigations ("HSI"), is conducting an

investigation into the activities of the defendant VOLODYMYR NEDOVIZ (hereinafter

"NEDOVIZ") and others known and unknown for illegally exporting, attempting to export,

and conspiring to export items to Ukraine without the required licenses from the DDTC and

the DOC, in violation of the AECA and IEEPA.

11.     The investigation has revealed that, between at least November 2014

and the present, NEDOVIZ and his co-conspirators have obtained export-controlled items –

including, among other things, rifle scopes and thermal imaging equipment included on the

USML and the CCL – and have knowingly exported, attempted to export, and conspired to

export these items to Ukraine without the required licenses from the DDTC and the DOC.

12.     The conspiracy to obtain and illegally export controlled items includes

NEDOVIZ and other known and unknown individuals who, based on the evidence described

below, appear to be located in the United States and Ukraine, and who are attempting to

acquire USML and CCL items from U.S.-based manufacturers and distributors of export-

controlled products.

13.     As described more fully below, the investigation has revealed that

NEDOVIZ and other individuals have engaged in a scheme where they would: (a) purchase

export-controlled rifle scopes and thermal imaging devices from U.S.-based manufacturers or

distributors or through Internet-based marketplaces like Amazon.com and eBay.com; (b)

provide false information in connection with the purchase of the export-controlled products,

ostensibly in order to avoid a request for an appropriate export license; (c) have the export-

controlled products shipped to Post Office Boxes ("P.O. Box") in the United States; (d)

repackage the export-controlled products and provide them to an international package

delivery company (commonly known as a "freight forwarder") for export to Ukraine; and (e)

make false statements to the freight forwarder about the contents of the packages, ostensibly so that the packages would be exported to Ukraine without the required licenses from the DDTC or DOC.

B.      The Defendant

14.     NEDOVIZ is a Lawful Permanent Resident ("LPR") of the United States, as well as a citizen and national of Ukraine.  According to U.S. government records, NEDOVIZ obtained an immigrant visa in approximately April 2014 and he arrived in the United States in approximately September 2014.  U.S. government records further indicate that NEDOVIZ left the United States on or about August 25, 2016, and he traveled to Ukraine.  On or about February 12, 2017, NEDOVIZ returned to the United States and he is believed to be residing within the Eastern District of New York.

15.     U.S. government records also indicate that NEDOVIZ has a twin brother, R.N.  R.N. is a citizen and national of Ukraine.  U.S. government records indicate that R.N. has been issued multiple B1/B2 visitor visas by the State Department.  These records indicate that R.N. last entered the United States on or about March 11, 2016, and that he last left the United States on or about May 7, 2016.  On or about May 9, 2016, R.N. was refused entry into the United States, and his visa was revoked based on evidence showing that he was intending to immigrate to the United States.  On or about June 17, 2016, the State Department declined to issue a visa to R.N. based on the previous revocation and an inability to overcome the evidence showing that he was an intended immigrant.  According to information included in R.N.'s visa applications, he currently resides in Kiev, Ukraine.

C.      The Purchase, Export, and Attempted Export of Controlled Products

16.      In approximately August 2016, federal law enforcement agents who were investigating the sale of export-controlled rifle scopes and thermal imaging devices on various Internet marketplaces became aware that NEDOVIZ and R.N. were attempting to sell what appeared to be export-controlled rifle scopes and thermal imaging devices.  Further, the investigation revealed that NEDOVIZ and R.N. were attempting to sell these items to individuals who were not located in the United States.

17.      Records obtained from Amazon.com, Inc. ("Amazon"), eBay, Inc. ("eBay"), and PayPal, Inc. ("PayPal") during the course of this investigation revealed that, between approximately November 27, 2014 and the present, Amazon and eBay accounts associated with NEDOVIZ, R.N. and other known co-conspirators were used to purchase at least 83 rifle scopes and thermal imaging devices that, based on my training and experience, are listed on the USML or the CCL and, thus, cannot be exported to Ukraine without a licenses from the DDTC or the DOC.  The business records from Amazon, eBay and PayPal further revealed that NEDOVIZ, R.N. and their co-conspirators paid approximately $190,000 for the rifle scopes and thermal imaging devices.

18.      In addition, the records obtained from Amazon, eBay and PayPal indicate that the majority of the export-controlled rifle scopes and thermal imaging devices purchased by NEDOVIZ, R.N. and their co-conspirators were purchased via digital devices with Internet Protocol ("IP") addresses[2] that resolve to Ukraine.

---

[2]      An IP address is a numerical label assigned to each device participating in a computer network.

19.     The records obtained from Amazon, eBay, and PayPal further reveal that at least 20 of the export-controlled rifle scopes and thermal imaging devices are directly linked to NEDOVIZ based on, among other things, the name, address, billing information, telephone number or credit card information provided by the purchaser.  NEDOVIZ's direct involvement in the purchase of the rifle scopes and thermal imaging devices is further supported by the fact that the majority of the IP addresses of the devices used to purchase the items resolve to locations that are consistent with NEDOVIZ's presumed whereabouts during the relevant time period (i.e., when NEDOVIZ is known to have been in the United States, the IP addresses generally resolve to locations in the United States, and when NEDOVIZ is known to have been outside the United States, the IP addresses generally resolve to Ukraine).

20.     The DOC has confirmed that the rifle scopes and thermal imaging devices linked directly to NEDOVIZ are export controlled and would require a license to export to Ukraine.

21.     Records obtained from PayPal further revealed that, between July 2016 and August 2016, R.N. made multiple purchases of rifle scopes and thermal imaging devices from one specific United States-based distributor ("Company A").  During the investigation, law enforcement agents obtained records relating to purchases made by R.N. from Company A.  These records indicated, among other things, that R.N. had purchased export-controlled rifle scopes and thermal imaging devices from Company A, and that, in connection with certain of these purchases, R.N. had made false statements about his citizenship and country of residence to Company A.

22.     For example, on or about August 8, 2016 and August 9, 2016, R.N. corresponded via email with Company A about the purchase of an ITAR-controlled rifle

scope.[3]  In the course of this correspondence, R.N. emailed Company A a signed export

compliance form which stated, in pertinent part:

> I understand that the products, technologies and services listed on
> the attached purchase order are subject to one or more of the
> export control laws and regulations of the U.S. Government and
> that they fall under the control jurisdiction of either the
> Department of State's International Traffic in Arms Regulations
> (ITAR) or the Department of Commerce's Export Administration
> Regulations (EAR).
>
> I understand that it is unlawful to export, or attempt to export or
> otherwise transfer or sell any hardware or technical data or
> furnish any service to any foreign person, whether abroad or in
> the United States (U.S.), for which a license or written approval
> of the U.S. Government is required, without first obtaining the
> required license or written approval from the department of the
> U.S. Government having jurisdiction.

23.     In addition, in the signed export compliance form that R.N. provided to

Company A, he falsely stated that he was a United States citizen residing in Ridgewood,

New York.  As noted above, evidence obtained during this investigation reflects that, at the

time of this purchase in August 2016, R.N. was neither a citizen of nor residing in the United

States.

24.     Additional records obtained from Company A revealed that Company

A shipped the items purchased by R.N. to the address: 9522 63rd Road, #303, Rego Park,

Queens, New York, 11374-1142.  Records obtained from Amazon and eBay revealed that

numerous other export-controlled rifle scopes and thermal imaging devices purchased by

NEDOVIZ, R.N., and their co-conspirators were shipped to this same address.

---

[3]      During the course of this investigation, the DDTC confirmed that the rifle scope
purchased by R.N. was on the USML and, thus, could not be exported to Ukraine without a
license from the DDTC.

25.     Law enforcement agents subsequently determined that 9522 63rd Road, Rego Park, Queens, New York, 11374-1142 is the address of a United Parcel Service, Inc. ("UPS") retail store (hereinafter the "UPS Store").

26.     Based on information obtained from the UPS Store, law enforcement agents determined that P.O. Box #303 – i.e., the P.O. Box to which the items purchased by NEDOVIZ and R.N. had been sent (hereinafter the "Rego Park P.O. Box") – was rented by NEDOVIZ.  Records obtained from the UPS Store indicated that NEDOVIZ began renting the Rego Park P.O. Box on or about August 13, 2015, and NEDOVIZ paid for the Rego Park P.O. Box with a credit card.

27.     During an interview with law enforcement agents, an employee of the UPS Store identified NEDOVIZ and one other individual (hereinafter "Individual A") as the persons who picked up packages sent to the Rego Park P.O. Box.  The employee stated that, initially, NEDOVIZ and Individual A would arrive at the UPS Store together to pick up packages delivered to the Rego Park P.O. Box. The UPS Store employee further stated that NEDOVIZ also purchased packaging and shipping supplies on several occasions from the UPS Store.  In addition, the UPS Store employee stated that, after approximately August 2016 (which, as noted above, is approximately the same time that NEDOVIZ left the United States), Individual A was the primary person who picked up packages sent to the Rego Park P.O. Box.

28.     The UPS Store employee also informed law enforcement agents that, when a package addressed to the Rego Park P.O. Box was received at the UPS Store, the UPS Store would send an automated email notification to an email address provided by NEDOVIZ.  Notably, the email address provided by NEDOVIZ also was used to correspond

with U.S.-based distributors of rifle scopes and thermal imaging devices about the purchase of export-controlled items.

29.     In November 2016, in the course of ongoing discussions with law enforcement agents, a UPS Store employee notified federal law enforcement agents that multiple packages addressed to the Rego Park P.O. Box recently had been received at the UPS Store and had been picked up by Individual A.  Based on the shipper information associated with the packages, law enforcement agents were able to identify two U.S.-based companies who are known distributors of export-controlled rifle scopes and thermal imaging devices (hereinafter "Company B" and "Company C").

30.     Records obtained from Company B indicated that R.N. had made at least two purchases of export-controlled items from Company B via Amazon.  Specifically, in February 2016, R.N. purchased a FLIR Systems Scout III-640 Thermal Imager for $3,499. Records obtained from Company B further indicated that, after R.N. made this purchase, he received an electronic invoice from Amazon.com which contained the following language:

> Export is strictly prohibited without a valid export license issued by the U.S. Department of State, Office of Defense Trade Controls, prescribed in the International Traffic in Arms Regulation (ITAR), Title 22, Code of Federal Regulations, Parts 120-130.

31.     Records obtained from Company B further indicated that the FLIR Systems Scout III-640 Thermal Imager was shipped to R.N. at "Meest-America, Inc., 460 Copper Drive, Newport, Delaware, 19804-9004."  According to its website, Meest-America, Inc. ("Meest) is a freight forwarder specializing in the export of packages from the United States to Russia and the former Soviet republics, including Ukraine.

32.     Records obtained from Company B further indicated that, on or about November 18, 2016, R.N. purchased a FLIR R-Series RS64 2-16x Rifle Scope for $6,499. In connection with the purchase of this rifle scope, R.N. received the same export-control warning from Amazon that he received following his February 2016 purchase. Company B's records indicated that the rifle scope was sent to R.N. at the Rego Park P.O. Box.

33.     The manufacturer of the two items purchased by R.N. from Company B confirmed that both items are on the USML and are ITAR-controlled. Thus, neither item can be exported to Ukraine without a license from the DDTC.

34.     Records obtained from Company C indicated that, on or about November 2, 2016, a ATN X-Sight II 3-14 Smart Rifle Scope was purchased via Amazon for $599. Records obtained from Company C further indicated that the invoice sent out in connection with the purchase of the rifle scope included the following language:

> Commodities, products, technologies, and services listed herein are subject to one or more of the U.S. export control laws and regulations enforced by the U.S. Department of State, the U.S. Department of Commerce, or the U.S. Department of the Treasury. It is unlawful and strictly prohibited to engage in conduct requiring a license or other approval from the proper U.S. Department without such license or approval. Such conduct includes, but is not limited to, the export, or attempt to export or otherwise transfer or sell any commodity, product or technical data, or furnishing any service to any foreign party, whether abroad or in the United States.

35.     Records obtained from Company C also indicated that the rifle scope was shipped on or about November 21, 2016 to "Uliana Malyk" at the Rego Park P.O. Box.

36.     The DOC has confirmed that the rifle scope purchased from Company C is included on the CCL and that it requires a license in order to be exported to Ukraine.

37.     Additional information obtained from an employee at the UPS Store indicated that, on or about December 5, 2016, the UPS Store received another package addressed to the Rego Park P.O. Box.  Information on the package indicated that the items included therein had been purchased via eBay.

38.     Records obtained from eBay revealed that, on or about December 2, 2016, a Leupold 115394 Mil. Dot. Mark .223 Rem. MOD 1 6-18x40mm Rifle Scope was purchased via eBay from a U.S.-based seller.  The eBay records further revealed that the Leupold rifle scope was shipped on or about December 3, 2016 to "Igor Kos" at the Rego Park P.O. Box.

39.     The DOC has confirmed that the Leupold rifle scope described above is included on the CCL, that it is controlled for "crime control" reasons, and that it requires a license in order to be exported to Ukraine.

40.     On or about December 12, 2016, law enforcement agents conducting surveillance of the UPS Store observed Individual A arrive at the UPS Store in a vehicle that, according to searches of law enforcement databases, is leased to NEDOVIZ (hereinafter, the "NEDOVIZ Vehicle").

41.     After entering the UPS Store, Individual A was observed a short time later exiting the UPS Store with several packages.  Law enforcement agents subsequently confirmed with the UPS Store that one of the packages that Individual A had in his possession was the box containing the export-controlled Leupold rifle scope.

42.     Individual A was observed placing the packages into the NEDOVIZ Vehicle.  Individual A then proceeded to drive the NEDOVIZ Vehicle to a dumpster located

in Brooklyn, New York.  At that point, Individual A was observed unpacking and examining the contents of the boxes that he had picked up from the UPS Store.

43.     After he unpacked the items from the boxes that he had picked up from the UPS Store, Individual A was observed exiting the NEDOVIZ Vehicle and throwing boxes and packaging materials into the dumpster.  A subsequent search of the dumpster by law enforcement agents revealed various opened packages and packing materials, including, among other things, a box and shipping materials associated with the December 2, 2016 purchase of the export-controlled Leupold rifle scope discussed above.  In addition, law enforcement agents found other documents that appeared to relate to other sales of rifle scopes.

44.     After throwing the packing materials in the dumpster, Individual A re-entered the NEDOVIZ Vehicle, and he drove it and parked it in the vicinity of 616 Avenue Y, Brooklyn New York.  Law enforcement agents later determined that Individual A lived in the second floor apartment at this address (hereinafter, the "Individual A Premises").  At this point, Individual A was observed engaging in additional unpacking and re-packing activities inside the NEDOVIZ Vehicle.

45.     Upon his arrival at the Individual A Premises, Individual A was observed bringing various materials, including boxes and other packaging materials, into the Individual A Premises.  Thereafter, through an open window of the Individual A Premises, Individual A was observed in the act of unpacking and re-packing various materials.  For example, Individual A was observed wrapping various items in packing materials and placing them into a new box.  In addition, at one point, Individual A was observed holding

up a cylindrical object consistent with the size and shape of a rifle scope. Individual A held this item up to his eye and appeared to look through it.

46.     On the morning of December 13, 2016, Individual A was observed leaving the Individual A Premises with several packages. Individual A was observed placing these packages in the NEDOVIZ Vehicle. Individual A then was observed taping a cardboard box in the NEDOVIZ Vehicle. Individual A was next observed at a Brooklyn, New York freight forwarding office of Meest. Individual A was observed leaving the Meest office a short time later without any packages.

47.     After Individual A left the Meest office, a law enforcement agent entered the Meest office and spoke with a Meest employee. The Meest employee confirmed that Individual A had just dropped off two packages for delivery to an address in Kiev, Ukraine.

48.     The Meest employee also provided the law enforcement agent with copies of the Customs Declaration forms that Individual A had filled out in order to have the two packages shipped to Ukraine. The Meest Customs Declaration forms filled out by Individual A indicated, among other things, that the packages contained "Toys," that they weighed approximately 19 pounds and 15.5 pounds, and that they were supposed to be delivered to an address in Kiev, Ukraine. Notably, Individual A did not use his true name, address, or telephone number on either Customs Declaration form.

49.     Additional information and records obtained from Meest indicated that R.N. was associated with a Meest account, and that all shipments associated with R.N.'s Meest account that were supposed to be shipped out of the United States were directed to be exported to Ukraine. In addition, based on other information and records obtained from

Meest and various banks, five different bank accounts in NEDOVIZ's name were used to make payments related to R.N.'s Meest account during the relevant time period.

50.      Information obtained from Meest further indicated that, in March 2016, a Meest location in New Jersey had received a package for R.N. from a U.S.-based distributor of export-controlled items.  Prior to the delivery of the package to Meest, R.N. provided instructions to Meest to ship the package to an address in Ukraine.  Per its standard practice of opening all packages prior to export, the New Jersey Meest office opened the package addressed to R.N. and determined that the package contained a rifle scope that was likely export controlled.[4]  Shortly after receiving the package, Meest notified R.N. that it could not export the package due to United States export laws.  On or about March 21, 2016, R.N. retrieved the package from the New Jersey Meest facility.

51.      Other information and records obtained from Meest indicated that, in November 2016, Individual A dropped off two packages at the Meest New Jersey location for delivery to Ukraine.  After opening the packages, Meest determined that, based on the unique packaging of the materials contained therein, the packages likely contained export controlled items, and, thus, Meest did not export the packages.  Meest attempted to contact Individual A about their inability to export the packages, but the number that Individual A had provided was a false number.

52.      After the recipient of the packages contacted Meest inquiring about the delivery status, Meest notified the recipient that the items could not be shipped, and, shortly

---

[4]      The DOC has confirmed that the rifle scope in question is included on the CCL and requires a license for export to Ukraine.

thereafter, Individual A picked the packages up from the Meest New Jersey location. At the time that he picked up the packages, Individual A was notified by Meest employees that the packages could not be exported because they included export-controlled items.

53.     In addition, Meest employees took pictures of the contents of the two boxes that Individual A dropped off and picked up. These photographs were provided to law enforcement, and they show that the boxes contained, among other things, four black cases that, based on my training and experience, are consistent with cases used to store and ship rifle scopes and thermal imaging devices, as well as a Burris AR-536 Prism rifle scope, which the DOC has confirmed is on the CCL and is export-controlled to Ukraine.

54.     On or about December 15, 2016, the two packages dropped off by Individual A at the Brooklyn Meest location were transported from the Meest office to John F. Kennedy International Airport ("JFK") in Queens, New York (with an intermediate stop at the Meest New Jersey location), along with several other packages destined for Ukraine.

55.     Once the two packages dropped off by Individual A were delivered by Meest to the Lufthansa Air Cargo facility at JFK, on December 16, 2016, officers from the United States Customs and Border Protection Service ("CBP") opened the packages and inspected their contents pursuant to their border search authority. Inside the packages, CBP officers found, among other things: (a) two (2) Armasight Zeus 640 2-16x42 (60Hz) Thermal Imaging Rifle Scopes valued at $5,995 each; (b) one (1) Armasight Zeus-Pro 640 2-16x50 (60Hz) Thermal Imaging weapons sight, valued at $8,995; and (c) one (1) FLIR Thermosight R-Series, Model RS64 60 mm 640x480 (30Hz) Rifle Scope, valued at $8,999.

56.     Based on the contents of the two boxes, Individual A provided false information about, among other things, the value of the exports and the nature of the contents of the boxes on the Customs Declaration forms that he filled out for Meest.

57.     Law enforcement agents spoke with the manufacturer of the items found in the boxes searched at JFK, and the manufacturer confirmed that all of the items are on the USML, are ITAR-controlled, and cannot be exported to Ukraine without a license from the DDTC.  Specifically, the manufacturer stated that for all of the items in question, it had previously obtained a State Department Commodity Jurisdiction – i.e., an official statement from the DDTC that the items in question were included on the USML.  In addition, during the investigation, the DDTC confirmed that the all four items are included on the USML.

58.     On December 20, 2016, the Honorable Lois Bloom, United States Magistrate Judge for the Eastern District of New York, signed a search warrant for the Individual A Premises.  See 16-M-1131 (filed under seal).

59.     On December 21, 2016, law enforcement agents conducted a search of the Individual A Premises.  Among other things, law enforcement agents recovered 12 rifle scopes and/or thermal imaging products that were subsequently confirmed by the DOC to be export-controlled and would require a license to be exported to Ukraine.

60.     During the search of the Individual A Premises, Individual A was present and agreed to speak with law enforcement agents.  During this and several subsequent, voluntary and non-custodial interviews with law enforcement agents, Individual A provided the following information, in sum and substance and in part:

a.      Individual A is a citizen and national of Ukraine who is currently residing in the United States pending an asylum application.

b.      Individual A knew both NEDOVIZ and R.N.

c.      At the direction of NEDOVIZ and R.N., Individual A had exported various products, including rifle scopes, from the United States to Ukraine, and Individual A had been paid by NEDOVIZ for his efforts.

d.      After Individual A agreed to assist NEDOVIZ and R.N. with exporting items to Ukraine, NEDOVIZ explained how the process worked.  Specifically, NEDOVIZ explained that NEDOVIZ and R.N. purchased products, including rifle scopes, from U.S.-based manufacturers and distributors; had the products delivered to P.O. Boxes in the United States; re-packaged the products; and exported the products to Ukraine using freight forwarders like Meest.  In addition, before NEDOVIZ left the United States for Ukraine in August 2016, NEDOVIZ showed Individual A the location of the Rego Park P.O. Box and another P.O. Box used in connection with the scheme that was located in Wilmington, Delaware (hereinafter, the "Delaware P.O. Box").  NEDOVIZ further explained how to pick up and re-package the items received at the P.O. Boxes and how to export the packages through Meest locations in New Jersey and Brooklyn.

e.      After NEDOVIZ left the United States for Ukraine in August 2016, Individual A was responsible for exporting items, including rifle scopes, to NEDOVIZ and R.N. in Ukraine.  Individual A described his typical process for exporting rifle scopes as follows:

i.      NEDOVIZ and R.N. would purchase a rifle scope from a U.S.-based manufacturer or distributor.

ii.        NEDOVIZ and R.N. would arrange for the rifle scope to be shipped to the Rego Park P.O. Box or the Delaware P.O. Box.

iii.        NEDOVIZ would inform Individual A when a package was going to be delivered to one of the P.O. Boxes.  NEDOVIZ also instructed Individual A about when to pick up the package and where to ship it.  In certain instances, NEDOVIZ instructed Individual A to ship packages to an address in Philadelphia, Pennsylvania.  In other instances, NEDOVIZ instructed Individual A to re-package the items that Individual A received and export them to addresses in Ukraine.

iv.        In the event that NEDOVIZ instructed that items be exported to Ukraine, NEDOVIZ would instruct Individual A to bring the items to a Meest location in New Jersey or Brooklyn, New York.  In addition, NEDOVIZ would provide Individual A with false information to include on the Customs Declarations for the exported packages or NEDOVIZ would instruct Individual A to provide similar false information on his own.  The false information included, among other things, false recipient names, false information about the items included in the package, and false information about the value of the package.

v.        After receiving instructions from NEDOVIZ, Individual A would re-package the items, drop them off at a Meest location, and complete the required Customs Declaration forms by making the false statements as instructed by NEDOVIZ.

vi.        Once the packages were dropped off with Meest, Individual A would provide tracking information to NEDOVIZ or R.N..

vii.     While initially NEDOVIZ provided the instructions to Individual A (as described above), over time, both NEDOVIZ and R.N. provided similar instruction to Individual A regarding the shipment and/or export of packages.

f.      Individual A knew that the export documentation that he filled out for Meest at NEDOVIZ's direction contained false information, but NEDOVIZ explained that this was not an issue because NEDOVIZ could change the documentation after the package was in route to Ukraine.

g.      Individual A communicated with NEDOVIZ and R.N. after Meest rejected the November 2016 shipment of rifle scopes discussed above.  NEDOVIZ instructed Individual A to pick up the package from the Meest New Jersey location and then attempt to export it from the Meest Brooklyn location.

h.      Individual A received approximately $9,000 from NEDOVIZ in connection with his work exporting items from the United States to Ukraine.  Some of these funds were intended to be used to cover shipping and packaging costs.  Other funds were intended to be payment to Individual A.

i.      NEDOVIZ gave Individual A his car to use while NEDOVIZ was in Ukraine.  The use of the car was free to Individual A and was intended to be used as partial payment for the work that Individual A was doing for NEDOVIZ and R.N..

61.      On or about February 12, 2017, NEDOVIZ arrived at JFK on Lufthansa Airlines Flight Number 410.  Upon his arrival, NEDOVIZ was selected by CBP officers for a secondary interview.  During this interview, when asked about his work in the United States, NEDOVIZ initially did not disclose that he was involved in exporting goods from the United States to Ukraine.  However, when questioned further by CBP officers, NEDOVIZ

eventually admitted that he exported goods to Ukraine. When asked to describe the export process, NEDOVIZ gave a description that was consistent with the description provided by Individual A, except for the fact that, when NEDOVIZ was asked about the products he exported, he did not mention rifle scopes or thermal imaging devices.

62.     When CBP officers asked NEDOVIZ if he shipped anything that "required additional documentation or licenses," NEDOVIZ became visibly nervous and mumbled something before answering. When he responded, NEDOVIZ falsely stated that he did not export any such items, but he knew someone else who had tried to ship a "rifle scope" to Ukraine. NEDOVIZ then corrected himself and said that, actually, his friend had attempted to export a "night vision scope." Further, when CBP officers asked for information about the "friend" who had attempted to export a "night vision scope," NEDOVIZ gave inconsistent answers about the friend's name and claimed that he could not remember any of the friend's contact information.

63.     NEDOVIZ told CBP officers that his export business involved the use of the Rego Park P.O. Box and the Delaware P.O. Box, but he falsely claimed that neither P.O. Box had been used for some time.

64.     When asked about other individuals who worked with him in his export business, NEDOVIZ gave the names of other individuals but, notably, did not mention the name of Individual A. Further, when asked about his car, NEDOVIZ falsely stated that the car had been left with a friend in Pennsylvania. Based on my training and experience, I believe that NEDOVIZ purposely declined to provide information about Individual A because of the fact that Individual A was involved in NEDOVIZ's criminal export scheme.

65.     On or about February 13, 2017, NEDOVIZ met in person with Individual A.  After that meeting, Individual A described the meeting to law enforcement agents.  Among other things, Individual A told law enforcement agents the following, in sum and substance and in part:

a.     NEDOVIZ called Individual A and asked Individual A to pick him up from a hotel in Manhattan (notably, this was not the address where NEDOVIZ told CBP officers that he would be staying while in the United States).

b.     NEDOVIZ told Individual A that he had been stopped by CBP upon his entry into the United States the day before.  NEDOVIZ speculated about the reasons why CBP would want to interview him.  Among other things, NEDOVIZ mentioned that CBP might be concerned with his involvement in buying and exporting rifle scopes.

c.     NEDOVIZ told Individual A that, in addition to Individual A, an associate named "Vasily" worked with NEDOVIZ to export rifle scopes from Pennsylvania to Ukraine.  NEDOVIZ also told Individual A that there were several rifle scopes at "Vasily's" home in Pennsylvania.

66.     On or about February 14, 2017, NEDOVIZ again met in person with Individual A.  In advance of this meeting, Individual A agreed to wear a recording device to capture the audio of his conversation with NEDOVIZ.  I have reviewed a summary translation of the recording of this conversation (the original conversation is in Ukrainian).  During this conversation, NEDOVIZ and Individual A can be heard discussing, among other things, certain of the rifle scopes that Individual A received on behalf of NEDOVIZ.  NEDOVIZ and Individual A can also be heard discussing the reasons for NEDOVIZ's interview with CBP, and NEDOVIZ can be heard saying that it may be because he is

suspected of shipping "prohibited goods like scopes." Finally, NEDOVIZ can be overheard telling Individual A about an individual in Ukraine who resells the rifle scopes in that country.

67.     On or about February 18, 2017, NEDOVIZ again met in person with Individual A. In advance of this meeting, Individual A again agreed to wear a recording device to capture the audio of his conversation with NEDOVIZ. I have reviewed a summary translation of the recording of this conversation (the original conversation is in Ukrainian). During this conversation, NEDOVIZ can be heard making the following statements, in sum and substance and in part:

a.     NEDOVIZ stated that he knew that Individual A had been contacted by U.S. law enforcement authorities. NEDOVIZ asked Individual A about what the U.S. law enforcement authorities asked Individual A and whether they asked any questions about NEDOVIZ.

b.     NEDOVIZ asked whether the U.S. law enforcement authorities found any of the rifle scopes that had been in the Individual A Premises. NEDOVIZ also asked whether U.S. law enforcement authorities searched Individual A's telephone.

c.     NEDOVIZ stated that he believed that there is an ongoing investigation into his export activities.

d.     When discussing rifle scopes that had recently been picked up by Individual A, NEDOVIZ stated: "I don't need them anywhere, in the car or anywhere. If they find me with these scopes, they will definitely lock me up. You understand yourself. All they need is a drop to fall on me and I will have no chance to say that it was not me."

e.      When discussing the CBP interview, NEDOVIZ stated that he was asked about his car and he "played dumb."  Based on my training and experience, I believe that NEDOVIZ was referring to the fact that he provided false information to CBP officers about where he had left his car while in Ukraine.

f.      Further, when again discussing a possible U.S. law enforcement investigation, NEDOVIZ stated the following:  "'I sent a lot of things,' but I said, 'It is not my job to check whether it is prohibited or not.  It is the duty of the shipping agent.'  They [referring to law enforcement] went to Brooklyn [referring to Meest] and told that broad, 'if you send some wrong sh*t again, you will be in jail, not him.'"

g.      NEDOVIZ told Individual A not to discuss exporting items or a potential investigation with R.N. and to limit contact about these topics in general.

68.      During the course of this investigation, both the DDTC and the DOC have confirmed that no export licenses have been obtained in the name of NEDOVIZ, R.N., or any other known co-conspirator.  Thus, to the extent that any of the above-described products were exported (or attempts were made to export them) out of the United States, there was not a valid license associated with those exports (or attempted exports).

III.   CONCLUSION

69.      Based on my training and experience, as well as the facts set forth in this affidavit, there is probable cause to believe that the defendant VOLODYMYR NEDOVIZ, together with others, did (a) knowingly, intentionally and willfully export, attempt to export, and conspire to export from the United States to Ukraine items on the USML, to wit: rifle scopes and thermal imaging equipment, without first having obtained a license from the DDTC, in violation of Title 22, Unites States Code, Section 2778 and Title

18, United States Code, Sections 371 and 2; and (b) willfully export, attempt to export, and conspire to export from the United States to Ukraine items on the CCL, to wit: rifle scopes and thermal imaging equipment, without first having obtained a license from the United States Department of Commerce, in violation of Title 50, United States Code, Section 1705, and Title 18, United States Code, Section 2

70.    It is respectfully requested that this Court issue and order sealing, until further order of the Court, all papers submitted in support of this application, including the application, the arrest warrant, and the complaint. I believe that sealing these documents is necessary because the defendant is currently at liberty, and the government plans to effectuate an arrest within the next week. Thus, the government seeks to seal the complaint and arrest warrant to ensure that the defendant does not learn that a complaint has been filed and an arrest warrant has been issued, and to prevent him from fleeing justice and avoiding arrest and prosecution. Further, as noted above, additional co-conspirators, including R.N., have not yet been arrested and are not aware of the investigation. As such, the government seeks to seal the complaint and arrest warrant so that NEDOVIZ's co-conspirators do not destroy evidence in advance of NEDOVIZ's arrest.

WHEREFORE, your deponent respectfully requests that an arrest

warrant be issued, and that the defendant VOLODYMYR NEDOVIZ be dealt with according

to law.

Joseph H. Rudnick
Special Agent
Federal Bureau of Investigation

Sworn to me before this
6th day of March, 2017

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK